

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-25-00089-CV

Allan Roy **MANKA** and The Law Offices of Allan R. Manka, P.C.,
Appellants

v.

Michelle Teresa **ACOSTA**,
Appellee

From the 131st Judicial District Court, Bexar County, Texas
Trial Court No. 2021CI11794
Honorable Tina Torres, Judge Presiding

Opinion by:     Lori I. Valenzuela, Justice

Sitting:        Irene Rios, Justice
                Lori I. Valenzuela, Justice
                H. Todd McCray, Justice

Delivered and Filed: May 13, 2026

AFFIRMED

In five issues, appellants Allan Roy Manka and The Law Offices of Allan R. Manka, P.C.

(collectively, "Manka") challenge a final judgment rendered after a jury verdict in favor of

appellant Michelle Teresa Acosta. We overrule Manka's appellate issues and affirm the judgment.

### BACKGROUND

Both Manka and Acosta are attorneys. On June 13, 2019, they appeared at a hearing in a

family law dispute in Wilson County District Court. The hearing was the first time Acosta

presented argument in court, and she and Manka had never met each other before that day. Acosta represented her brother, Keith, and Manka represented Keith's ex-wife, Cindy. Acosta's and Keith's father, Hipolito, attended the hearing to support both of his children.

At some point during the proceedings, Keith and Cindy decided that they wanted to try to work out their differences on their own. While they conferred privately, their attorneys and Hipolito waited in the courthouse lobby. Both Acosta and Hipolito testified that during that time, Manka told them that when he represents women in family law matters, he likes to put his arms around his clients to make his opposing counsel and his clients' husbands or ex-husbands uncomfortable.

Security camera footage from the courthouse lobby showed that while they were waiting for their clients to return, Manka moved next to Acosta and slid his hand across her lower back and around her waist. He then walked away from her. A few minutes later, he returned to her side, touched her hair, and put his arm around her shoulder.

Keith and Cindy eventually rejoined their attorneys in the lobby and announced that they had reached an agreement. Before the parties left the courthouse, Manka moved to stand next to Acosta once again. Acosta extended her hand toward him, but instead of taking her hand, he leaned into her personal space. Acosta testified that he then grabbed her buttocks and squeezed it. She slapped his chest, and he left the courthouse. Acosta reported the grabbing incident to the Wilson County Sheriff's Department the next day, and a deputy filed a misdemeanor charge of assault by contact against Manka.[1]

---

[1] The clerk's record shows that Manka pleaded no contest to the criminal charge. In a civil trial, a no contest plea is not admissible against the defendant who made the plea. TEX. R. EVID. 410(a)(2). The jury in this case was not informed of Manka's plea.

In June 2021, Acosta sued Manka for assault by offensive physical contact and intentional infliction of emotional distress. In August 2021, Manka filed a counterpetition alleging defamation, business disparagement, and tortious interference with contract. Acosta filed motions to dismiss Manka's counterclaims under the Texas Citizen's Participation Act ("TCPA") and Rule 91a of the Texas Rules of Civil Procedure. The trial court denied Acosta's TCPA motion, but it granted her Rule 91a motion. When Manka re-filed his counterclaims in March 2023, Acosta filed a second Rule 91a motion, which the trial court granted.

The parties tried Acosta's claims to a Bexar County jury in September 2024. At that time, Acosta's live pleading was her fourth amended petition. After hearing the evidence, the jury found in Acosta's favor on her assault and intentional infliction claims and awarded her $3 million in past mental anguish damages and $2 million in future mental anguish. The jury rejected Acosta's request for punitive damages.

After the verdict, Acosta sought, and the trial court granted, leave to file a fifth amended petition to conform the pleaded amount of damages to the jury's verdict. The trial court then signed a final judgment consistent with the jury's verdict. After his post-trial motions were overruled by operation of law, Manka filed this appeal.

**ANALYSIS**

***Legal and Factual Sufficiency***

In his first, second, and fourth issues, Manka challenges the legal and factual sufficiency of the evidence supporting the jury's verdict.

*Standard of Review*

When an appellant challenges the legal sufficiency of the evidence supporting an adverse finding on which he did not bear the burden of proof at trial, he must establish that no evidence

supports the finding. *See In re Marriage of Thrash*, 605 S.W.3d 224, 230 (Tex. App.—San Antonio 2020, pet. denied). We view the evidence in the light most favorable to the verdict, crediting the evidence that supports the challenged finding if a reasonable factfinder could and disregarding contrary evidence unless a reasonable factfinder could not. *See id.* If more than a scintilla of evidence supports the finding, we must reject the legal sufficiency challenge. *See Tex. Outfitters Ltd., LLC v. Nicholson*, 572 S.W.3d 647, 653 (Tex. 2019). More than a scintilla of evidence exists if reasonable and fair-minded people could differ in their conclusions. *See, e.g.*, *Ojeda v. Wal-Mart Stores, Inc.*, 956 S.W.2d 704, 708 (Tex. App.—San Antonio 1997, pet. denied).

In a factual sufficiency review, we conduct a neutral review of the evidence and consider the entire record, including evidence contrary to the challenged finding. *See Vast Constr., LLC v. CTC Contractors, LLC*, 526 S.W.3d 709, 723 (Tex. App.—Houston [14th Dist.] 2017, no pet.). To prevail, the appellant must show the challenged finding is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *See Abrams v. Salinas*, 467 S.W.3d 606, 614 (Tex. App.—San Antonio 2015, no pet.) (citations omitted).

"In either a legal or factual sufficiency review, issues of credibility and reconciling conflicts within the evidence are for the jury." *4922 Holdings, LLC v. Rivera*, 625 S.W.3d 316, 328 (Tex. App.—Houston [14th Dist.] 2021, pet. denied). We may not substitute our own judgment for the jury's, even if the evidence might support a different result. *See United Parcel Serv., Inc. v. Rankin*, 468 S.W.3d 609, 615 (Tex. App.—San Antonio 2015, pet. denied).

*Assault*

In his first issue, Manka challenges the finding in Acosta's favor on her assault claim. "In Texas, an assault is both an offense against the peace and dignity of the State, as well as an invasion of private rights." *Foye v. Montes*, 9 S.W.3d 436, 441 (Tex. App.—Houston [14th Dist.] 1999, pet.

denied). Because "[t]he elements of a civil assault mirror those of a criminal assault," a person can be civilly liable for assault if he intentionally or knowingly caused physical contact with another person when he knew or reasonably should have believed the other person would consider the contact offensive or provocative. *See Loaisiga v. Cerda*, 379 S.W.3d 248, 256 (Tex. 2012); *Sanchez v. Striever*, 614 S.W.3d 233, 239 (Tex. App.—Houston [14th Dist.] 2020, no pet.); *see also* TEX. PENAL CODE § 22.01(a)(3). Manka argues the evidence does not support the jury's assault finding because Acosta did not make a claim of bodily injury and there is no "objectively verifiable evidence" that he knew or reasonably should have believed that she would find his contact offensive or provocative.

While a showing of bodily injury can support a claim of assault, it is not required where, as here, the plaintiff alleges assault by offensive contact. *See* TEX. PENAL CODE § 22.01(a)(3); *Hockman v. Rogers*, No. 12-09-00441-CV, 2010 WL 2784435, at *3 (Tex. App.—Tyler, July 14, 2010, no pet.) (mem. op.); *Moore v. Aqrawi*, No. 01-03-00917-CV, 2007 WL 2743494, at *3 (Tex. App.—Houston [1st Dist.] Sept. 20, 2007, no pet.) (mem. op.). Consequently, the only question before us is whether the evidence would permit the jury to find that Manka's mental state—*i.e.*, what he knew or reasonably should have believed at the relevant time—supported Acosta's assault claim.

"A plaintiff may establish the defendant's mental state by circumstantial evidence." *La.-Pac. Corp. v. Andrade*, 19 S.W.3d 245, 247 (Tex. 1999). Here, it was undisputed that Acosta and Manka had never met each other before the day at issue. Acosta testified that on that day, Manka grabbed her buttocks with "a huge handful that got a lot of my rear end in it and squeezed it." She also presented video from the courthouse security cameras that showed the alleged incident. While the video did not clearly show Manka grabbing Acosta's buttocks, it showed him moving to stand

next to her and then leaning into her personal space. A moment after he leaned in, she slapped him on the chest and he walked away. As he walked away, she said something to him while gesturing toward her buttocks. The video did not have sound, but Acosta testified that she yelled, "I bet you've been waiting to do that all day." Acosta also testified that earlier that day, before he touched her the first time, Manka told her that he would "kind of do like this thing where [he] get[s] close to, you know, [his] clients and make[s] the other party or the ex-husbands or soon-to-be ex-husbands or opposing counsel uncomfortable."

Acosta's brother, Keith, was present during the alleged grabbing incident. He testified that Manka "ran off as he was laughing" immediately after that incident and that after he left, Acosta "said something like, Dude, he just grabbed my butt." While Keith did not directly observe Manka grabbing Acosta's buttocks, he saw Manka "touch[] her in a way that startled her . . . on the lower back area closer to the buttocks area."

Acosta's father, Hipolito, was not present during the grabbing incident, but he witnessed two earlier instances of Manka touching Acosta. He told the jury that when Manka touched Acosta the first time, he considered "either confronting [Manka] or saying something," but he chose not to do so because he "knew how [his intervention] would impact [Acosta] at that particular time" and he "did not want to overreact." He also testified that he heard Manka say that "when he represented females, to intimidate or make their spouses angry, he would put his arm around them." Hipolito described those statements as "very unprofessional. It was very uncomfortable." He testified that he was a law enforcement officer who had appeared in court many times and that he "had never seen any type of such behavior or anybody make the kind of statement that [Manka] did."

Manka testified that he was born in 1949, that he once worked in the district attorney's office, and that at the time of trial, he had been practicing law for 50 years. He testified that he did not grab Acosta's buttocks and that he had no way of knowing she would consider his actions offensive or provocative. He did not deny, however, that he slid his hand around Acosta's lower back and waist or that he moved her hair off her shoulder, and the jury saw video showing that he did. He also testified that grabbing another attorney's buttocks is "not professional. It's not appropriate at all."

The jury was free to credit Acosta's version of events over Manka's. *See City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005); *Fayette v. Reyes*, No. 04-18-00317-CV, 2019 WL 3937280, at *3 (Tex. App.—San Antonio Aug. 21, 2019, no pet.) (mem. op.). When viewed in the light most favorable to Acosta, the evidence described above would permit reasonable people to conclude that Manka grabbed and squeezed Acosta's buttocks without her consent; that he knew his actions were "not professional" and "not appropriate at all"; and that he deliberately engaged in such actions because she was his opposing counsel and he wanted to make her uncomfortable. *See Ojeda*, 956 S.W.2d at 708. Furthermore, the evidence to the contrary is not so overwhelming as to render the jury's verdict clearly wrong or unjust. *See Abrams*, 467 S.W.3d at 614. The evidence is therefore both legally and factually sufficient to support the jury's finding that Manka intentionally or knowingly touched Acosta in a way that he knew or reasonably should have known she would find offensive or provocative. *See Striever*, 614 S.W.3d at 239 (identifying elements of civil assault).

We overrule Manka's first issue.

*Intentional Infliction of Emotional Distress*

In his second issue, Manka argues the evidence is legally and factually insufficient to support the jury's finding on Acosta's intentional infliction of emotional distress claim. He contends there is no evidence that his conduct was extreme or outrageous or that he consciously disregarded a high probability of inflicting severe emotional distress. He also argues that intentional infliction is a "gap-filler" tort that is not available where the gravamen of a plaintiff's claim is really another tort—here, civil assault. Acosta responds that we need not reach this issue because Manka has not shown he was harmed by this purported error. TEX. R. APP. P. 44.1(a).

We agree with Acosta. As the appellant, Manka bore the burden to establish that the trial court erred *and* that the error requires a reversal of the trial court's judgment. *See id.*; *see also Schneider v. Quintana Energy Servs., LLC*, 691 S.W.3d 738, 753 (Tex. App.—Houston [14th Dist.] 2024, no pet.). Manka argues that the trial court should have refused to submit the liability question on the intentional infliction claim to the jury. But he has not presented any argument or authority establishing that any error in submitting that question probably led to the rendition of an improper judgment or prevented him from making his appellate arguments to this court. TEX. R. APP. P. 44.1(a). He has not, for example, raised any appellate challenges to the wording or submission of the damages question, which asked the jury to determine an appropriate amount of compensation for Acosta if it found Manka liable for either of her claims. The jury found in Acosta's favor on both of her claims, and we have already affirmed its finding on her assault claim. Manka has not argued that the jury's findings on the assault and/or damages questions were "significantly influenced by" the purportedly erroneous submission of the intentional infliction theory. *See Horton v. Kan. City S. Ry. Co.*, 692 S.W.3d 112, 141–42 (Tex. 2024). Nor has he argued that this is a situation where we must presume harm because a potentially invalid claim

could have formed the sole basis for the jury's findings. *Cf. Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 389 (Tex. 2000).

For these reasons, Manka has not established that any error in submitting the intentional infliction claim requires us to reverse the trial court's judgment. We therefore overrule his second issue.

*Mental Anguish Damages*

In his fourth issue, Manka argues the evidence is legally and factually insufficient to support the jury's award of past and future mental anguish damages. Compensable mental anguish "implies a relatively high degree of mental pain and distress. It is more than mere disappointment, anger, resentment or embarrassment, although it may include all of these." *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995) (citation omitted). A plaintiff must present "evidence of the nature, duration, and severity of [his] mental anguish . . . to establish the existence of mental anguish damages." *Gregory v. Chohan*, 670 S.W.3d 546, 554 (Tex. 2023) (plurality op.) (internal quotation marks omitted); *Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 231 (Tex. 2011).

If the plaintiff establishes the existence of compensable mental anguish, "[t]here must also be some evidence to justify the amount awarded." *Saenz v. Fid. & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996). "'There must be evidence that the amount found is fair and reasonable compensation, just as there must be evidence to support any other jury finding.'" *Bentley v. Bunton*, 94 S.W.3d 561, 606 (Tex. 2002) (quoting *Saenz*, 925 S.W.2d at 614). "In short, '[j]uries cannot simply pick a number and put it in the blank.'" *Gregory*, 670 S.W.3d at 554 (quoting *Saenz*, 925 S.W.2d at 614).

Manka does not contend that Acosta failed to show compensable mental anguish. He argues only that the evidence was legally and factually insufficient to support the amount awarded

for past and future mental anguish. As support for this assertion, he relies almost entirely on the Texas Supreme Court's opinion in *Gregory*. *See id.* As we have previously noted, *Gregory* "'is a plurality opinion lacking precedential value[.]'" *Elizondo v. Reyna*, No. 04-24-00284-CV, 2025 WL 2462764, at *9 (Tex. App.—San Antonio Aug. 27, 2025, no pet.) (mem. op.) (quoting *Kelly Custom Homes, LLC v. Hopper*, No. 14-23-00793-CV, 2024 WL 3765393, at *8–9 (Tex. App.—Houston [14th Dist.] Aug. 13, 2024, pet. denied) (mem. op.)). "Under these circumstances, the holding of the Court—to the extent that there is a holding—consists of the position taken by those justices who concurred on the narrowest grounds." *City of Baytown v. Fernandes*, 674 S.W.3d 718, 727 (Tex. App.—Houston [1st Dist.] 2023, no pet.).

In *Gregory*, a majority of the justices rejected what the plurality and Justice Devine's concurring opinion referred to as "unsubstantiated anchoring," or tying the amount of mental anguish damages "to objects or values with no rational connection to the facts of the case." *Gregory*, 670 S.W.3d at 557–60 (plurality op.); *id.* at 569–70 (Devine, J., concurring). Both the plurality and Justice Devine's concurrence also explained that a mental anguish award "cannot be based on mere passion, prejudice, or improper motive," such as a desire to punish the tortfeasor. *See id.* at 570 (Devine, J., concurring); *id.* at 558 (plurality op.).

Manka does not expressly contend that this case involves the kind of unsubstantiated anchoring the Texas Supreme Court considered in *Gregory*. He argues, however, that Acosta's trial counsel improperly asked the jury to "punish" him. It is true that Acosta's trial counsel suggested a $25 million award as an appropriate "punishment" for Manka's actions. Because the court's charge asked the jury to consider an award of punitive damages, that line of argument was not inherently improper.

- 10 -

However, Acosta's trial counsel also told the jurors that if they could not reach a unanimous verdict on whether to award punitive damages, they should "put the 25 million in mental anguish. That only takes ten [votes]." Manka did not object to these statements below, and he does not argue on appeal that they amounted to incurable jury argument. *See Living Ctrs. of Tex., Inc. v. Penalver*, 256 S.W.3d 678, 680–81 (Tex. 2008) (per curiam). As a result, to the extent that he contends that these statements independently constituted reversible error, he has waived that argument. *See Reliant Energy Servs., Inc. v. Cotton Valley Compression, L.L.C.*, 336 S.W.3d 764, 794 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

That leaves us with the issue of whether trial counsel's "punishment" statements call the mental anguish damages into question. The *Gregory* plurality explained that "if the reasons offered in justification of the amount awarded are rational and do not partake of prohibited motives, courts should defer to the jury's verdict." *Gregory*, 670 S.W.3d at 562.

Unlike the facts of *Gregory*, the record in this case does not mandate a conclusion that the jury "part[oo]k of prohibited motives" or otherwise heeded Acosta's call to use the mental anguish award to punish Manka. *Cf. id.* First, and most obviously, while Acosta's counsel suggested $25 million as an appropriate "punishment," the jury awarded Acosta only a fraction of that amount. More importantly, however, the amounts the jury settled on were rationally connected to both the evidence presented at trial and the unchallenged portions of Acosta's closing argument.

The jury heard Acosta's testimony that as a result of the assault, she had difficulty sleeping and suffered panic attacks because she "felt like [her] person, [her] space, [her] protective space had been violated." She "felt sick to [her] stomach, [she] was nauseous" and she "felt like throwing up." She testified that the assault re-triggered the post-traumatic stress disorder that she had previously suffered after an unknown assailant slashed her throat when she was in college. She

also explained that when Manka slid his hand around her waist, the feeling was similar to "where that knife was going around the front of [her] neck." She told the jury that after Manka's assault, her PTSD:

> would flare up whenever I would be around male attorneys that I didn't really know, opposing counsel especially, which—it occurred every time I'd go to the bar with my husband, if he wasn't standing next to me, whether or not a man was going to touch me inappropriately. And it made it hard for me to be in a professional setting for awhile. . . . I would say up until almost 2001—'21, sorry, '21.

Similarly, Hipolito testified that "[i]t took a long time [after the incident with Manka] for [his daughter] to start building [her confidence] up again." The jury could have rationally determined that this evidence, which showed that the assault triggered memories of the prior violent attack and affected Acosta's ability to engage in her chosen profession, was relevant to the amount required to compensate her for her past mental anguish. *See Elizondo*, 2025 WL 2462764, at *9; *see also Garza v. Escamilla*, 712 S.W.3d 718, 731 (Tex. App.—Houston [14th Dist.] 2025, no pet.) ("[T]here is a market to avoid pain, and a constitutional prohibition against inflicting it unnecessarily—which shows that pain is both expensive and intolerable, themes that have a rational connection to a claimant in a personal injury case.").

To deal with the issues described above, Acosta sought out mental health treatment and began taking a new medication for anxiety and depression. She did not take that medication before the incident with Manka. In addition to her testimony, Acosta submitted some of her treating providers' records into evidence. Those records, which contained documentation of several mental health appointments in 2021 and 2022, showed that she reported suffering from panic attacks, depression, anxiety, excessive worrying, and a lack of interest in intimacy. One document showed that Acosta suffered a panic attack on New Year's Eve of 2021 that required treatment in the emergency room.

Acosta testified that at one point, she was paying $300 an hour for her mental health treatment. During closing argument, her trial counsel reminded the jury of the $300 an hour amount and stated:

> I calculated 29 minutes, 1740 seconds of time that [Manka] spent with [Acosta] that day, between the time that he touched her the first time and the last. $300 an hour is what she was willing to pay a psychiatrist to try to help her get through this. The $300 of the 1740 seconds that she will never get back that he took from her, what is that? Since then, 167 billion seconds, 2,700,000 minutes, 46,000 hours, 1933 days since this happened.

Acosta's trial counsel then suggested that the jurors consider "how much would you give in a day to not go through this reminder in this situation." *See Elizondo*, 2025 WL 2462764, at *9 (affirming a "per day" calculation of mental anguish damages); *Garza*, 712 S.W.3d at 727–31 (same); *Kelly Custom Homes*, 2024 WL 3765393, at *8 (same).

The *Gregory* plurality explained that the necessary rational basis for the dollar amount of an award of mental anguish damages "may be revealed by lawyer argument rationally connecting the amount sought—or on appeal, the amount awarded—to the evidence." *Gregory*, 670 S.W.3d at 561. In her appellate briefing, Acosta notes that the jury's award of $3 million for past mental anguish is roughly equivalent to $1,500 a day—the cost of five hours of therapy—for each of the 1,933 days since the assault. While Manka's reply brief correctly notes that Acosta's trial counsel did not explicitly perform this calculation for the jury, that sum can be rationally deduced from the numerical "anchors" Acosta's trial counsel asked the jury to consider. We therefore reject Manka's suggestion that this calculation is simply a post-hoc appellate justification for an award that is unsupported by the trial record. *Cf. id.*

We do not suggest that the evidence showed Acosta actually attended therapy for 5 hours a day on each of the 1,933 days between the assault and the jury's verdict. If she had, that amount would be compensable as medical expenses, rather than as non-economic mental anguish damages.

*See Finley v. P.G.*, 428 S.W.3d 229, 233–34 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (considering cost of mental health treatment in evaluating award of future medical expenses). But after reviewing the evidence in the light most favorable to the judgment, we conclude that the number of days between the assault and the jury's verdict and the cost of one hour of therapy were appropriate anchors, substantiated by the evidence, that the jurors could rely on to decide what they "would give in a day to not go through this reminder in this situation." *See Elizondo*, 2025 WL 2462764, at *9. We therefore disagree with Manka's contention that *Gregory* requires reversal of the award for past mental anguish. *Cf. Gregory*, 670 S.W.3d at 563 ("Crucially, plaintiffs' counsel at no point in these proceedings has attempted to proffer a rational argument justifying either the amount sought or the amount awarded.").

Acosta also presented evidence demonstrating "a reasonable probability that [s]he would suffer compensable mental anguish in the future." *Zoanni v. Hogan*, 715 S.W.3d 47, 90 (Tex. App.—Houston [1st Dist.] 2024, pet. denied). She testified that she was still experiencing mental anguish symptoms at the time of trial in 2024, more than five years after the assault. She specifically noted that she sometimes "still ha[s] issues with men being around [her]" if she does not "know what their intentions are and whether or not they are going to get—think that [she] want[s] it or might enjoy it as Mr. Manka said in his testimony yesterday." She also testified that she "[a]t times" still struggled with anxiety attacks and trouble sleeping. Additionally, Keith testified:

> I think that her being assaulted in that way, you know, with that disrespect really affected her—her outlook on her profession, her professionalism with her peers and, you know, it hardened her for—for a long time. And I think it still hardens her today.

Keith further testified that the depression and lack of confidence he saw in Acosta after the assault is "still around. It's still apparent. She gets anxiety attacks sometimes." Based on this testimony,

the jury could have rationally determined that Acosta's mental anguish had not resolved in the five years since the assault and would likely continue in the future. *See, e.g.*, *PNS Stores, Inc. v. Munguia*, 484 S.W.3d 503, 518 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (substitute op.).

After reviewing the record, we conclude it does not show that Acosta's closing arguments "destroyed any rational connection the verdict has to the mental anguish evidence presented." *Gregory*, 670 S.W.3d at 577 (Bland, J., concurring). The jury's verdict, while certainly large, has a rational connection to the evidence presented below and therefore does not run afoul of *Gregory*.

We overrule Manka's fourth issue.

### Dismissal of Manka's Counterclaims

In his third issue, Manka argues the trial court erred by granting Acosta's motion to dismiss his counterclaims for defamation and business disparagement under Texas Rule of Civil Procedure 91a.

### Standard of Review and Applicable Law

Texas Rule of Civil Procedure 91a provides that "a party may move to dismiss a cause of action on the grounds that it has no basis in law or fact." TEX. R. CIV. P. 91a.1. "A cause of action has no basis in law if the allegations, taken as true, together with inferences reasonably drawn from them, do not entitle the claimant to the relief sought." *Id.* "A cause of action has no basis in fact if no reasonable person could believe the facts pleaded." *Id.*

We review a trial court's ruling on a Rule 91a motion de novo. *See Bethel v. Quilling, Selander, Lownds, Winslett & Moser, P.C.*, 595 S.W.3d 651, 654 (Tex. 2020). "If an order granting a Rule 91a motion does not specify the grounds for dismissal, a party appealing the order must challenge every ground upon which the trial court could have granted the motion." *In re Est. of Savana*, 529 S.W.3d 587, 592 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

*Application*

Acosta filed two Rule 91a motions: the first on November 1, 2021, when she sought the dismissal of Manka's original counterpetition, and the second on May 12, 2023, when she sought the dismissal of Manka's second amended counterpetition. In both motions, she argued that Manka's pleadings established that his counterclaims were barred by the statute of limitations. *See Bethel*, 595 S.W.3d at 656 (Rule 91a permits dismissal on an affirmative defense if the defense is conclusively established by the facts in plaintiff's petition). She also separately argued that Manka's counterclaims had no basis in law or fact. TEX. R. CIV. P. 91a.1. The trial court granted Acosta's first Rule 91a motion on December 17, 2021, and it granted her second motion on June 30, 2023.

Neither the December 17, 2021 order nor the June 30, 2023 order states any reasons for the trial court's decision to grant Acosta's Rule 91a motions. Manka argues, however, that the trial court's December 13, 2021 judge's notes show that it granted Acosta's first motion because it accepted her argument that Manka's counterclaims were barred by the statute of limitations. He contends that he timely filed his counterclaims and the trial court therefore erred by granting the Rule 91a motions.

There are two problems with this argument. First, even if we accept Manka's description of what is stated in the December 2021 judge's notes,[2] we have repeatedly held that judge's notes are solely for the trial court's convenience and do not qualify as an order. *See, e.g.*, *In re A.K.P.*, No. 04-20-00305-CV, 2020 WL 5027398, at *1 (Tex. App.—San Antonio Aug. 26, 2020, no pet.) (per curiam) (mem. op.). *In re L.H.*, No. 04-13-00174-CV, 2013 WL 3804585, at *1 (Tex. App.—San Antonio July 17, 2013, no pet.) (per curiam) (mem. op.). Second, Manka has not explained

---

[2] Other than the trial judge's name, the cause number, the parties' names, and the phrase "SLAPP <u>does not</u> apply," the copy of the judge's notes in our record is largely illegible.

why the December 2021 judge's notes have any relevance to our review of the second Rule 91a order, which the trial court signed nearly two years later.

Because the trial court's orders do not state the reasons for the rulings, Manka bore the burden on appeal to defeat each of the grounds Acosta raised in her Rule 91a motions. *See In re Est. of Savana*, 529 S.W.3d at 592; *Parkhurst v. Off. of Att'y Gen. of Tex.*, 481 S.W.3d 400, 402 (Tex. App.—Amarillo 2015, no pet.). While Manka's appellate briefing contends that he filed his counterclaims within the applicable statutes of limitations, he does not address any of the other arguments Acosta raised. We will not make those arguments for him. *See, e.g.*, *Sonat Expl. Co. v. Cudd Pressure Control, Inc.*, 271 S.W.3d 228, 236 (Tex. 2008) ("[A]n appellate court cannot reverse on a ground an appellant has never raised."); *In re Est. of Marley*, 390 S.W.3d 421, 425 (Tex. App.—El Paso 2012, pet. denied) ("We have no duty—or even right—to perform an independent review of the record and applicable law to determine whether there was reversible error because, by doing so, we would abandon our role as neutral adjudicators and become an advocate."). Because Manka did not establish "that no ground urged within the motion to dismiss supported the trial court's decision," we overrule his third issue. *See Parkhurst*, 481 S.W.3d at 403.

### *Acosta's Pleading Amendments*

In his fifth issue, Manka argues that the trial court abused its discretion by allowing Acosta to amend her pleadings to conform to the jury's verdict.

### *Standard of Review and Applicable Law*

The Texas Rules of Civil Procedure provide that parties may amend their pleadings "at such time as not to operate as a surprise to the opposite party[.]" TEX. R. CIV. P. 63; *see also* TEX. R. CIV. P. 66. Any amendments made "within seven days of the date of trial or thereafter . . . shall

be filed only after leave of the judge is obtained," and the trial court shall grant leave to amend "unless there is a showing that such filing will operate as a surprise to the opposite party." Tᴇx. R. Cɪᴠ. P. 63.

A trial court may permit a party to amend its pleadings after the verdict, but before the judgment, to conform to the jury's verdict. *See Greenhalgh v. Serv. Lloyds Ins. Co.*, 787 S.W.2d 938, 940 (Tex. 1990); *see also* Tᴇx. R. Cɪᴠ. P. 66. The trial court may not deny leave unless: (1) "the opposing party presents evidence of surprise or prejudice" or (2) "the amendment asserts a new cause of action or defense, and thus is prejudicial on its face, and the opposing party objects to the amendment." *Greenhalgh*, 787 S.W.2d at 939 (internal citations omitted). "The burden of showing prejudice or surprise rests on the party resisting the amendment." *Id.* "An amended pleading that changes only the amount of damages sought does not automatically operate as surprise within the contemplation of Rule 63." *Id.* at 940.

A trial court has broad discretion to permit pleading amendments. *See Benavidez v. Isles Constr. Co.*, 726 S.W.2d 23, 25 (Tex. 1987). A trial court does not abuse its discretion unless its decision is arbitrary, unreasonable, or made without reference to guiding rules or principles. *See Murphy v. Arcos*, 615 S.W.3d 676, 696 (Tex. App.—Dallas 2020, pet. denied).

*Application*

After the jury rendered its verdict, Acosta sought leave to amend her petition on the grounds that it "sought damages of less than $250,000[.]" But Acosta's live petition at the beginning of trial stated that she sought "monetary relief of *over* $250,000 or less, including damages of any kind, penalties, court costs, expenses, prejudgment interest, and attorney fees." (emphasis added). While this phrasing is not a model of clarity, Manka did not specially except to it and thus waived any argument that it did not satisfy Texas's fair-notice pleading standard. *See* Tᴇx. R. Cɪᴠ. P. 90.

Moreover, Manka himself testified at trial that Acosta was "asking for a million dollars[.]" For these reasons alone, the trial court could have reasonably determined that Manka was not surprised or prejudiced by the requested amendment.

But even if the trial court agreed that Acosta's petition did support the jury's verdict, it could have reasonably determined that Manka failed to establish surprise or prejudice. In his response opposing the pleading amendment, Manka argued only that he "understood [his] liability exposure to be capped at $250,000.00." *See Greenhalgh*, 787 S.W.2d at 940. He appeared to suggest that "altering [that] premise" might have changed his defensive strategies at trial, and he complained that he was "denied an opportunity to make [his] argument opposing the trial amendment prior to submission of the jury charge." But he did not argue that the proposed amendment raised any new substantive matters. *See, e.g.*, *Am. Med. Int'l, Inc. v. Giurintano*, 821 S.W.2d 331, 334–35 (Tex. App.—Houston [14th Dist.] 1991, no writ) (op. on reh'g). Nor did he explain how he would have changed his trial strategy, what other evidence he might have sought out or presented, or what additional or different arguments he would have made. *See id.* Finally, he did not present any evidence to support his claims of surprise or prejudice. *See Murphy*, 615 S.W.3d at 697–98.

For these reasons, the trial court did not abuse its discretion by permitting Acosta to amend her pleadings to conform to the jury's verdict. We overrule Manka's fifth issue.

## CONCLUSION

Having overruled each of Manka's appellate issues, we affirm the trial court's judgment.

Lori I. Valenzuela, Justice